Your Honor, as it may please the Court, I'm John Wells representing Chaplain Klingenschmitt. One of the interesting things about this case is if the same pattern were to happen today, chances are we wouldn't be here. The reason being is that Congress, in some respects as a result of this case and others, acted in 2013-2014 with the National Defense Authorization Acts to apply and ensure that the Religious Freedom Restoration Act was applied to the military chaplains, and that's been codified by the Secretary of Defense and Department of Defense Instruction 1300.17. It's no longer possible, or in fact it's quite illegal, for somebody to get into the situation of saying when a chaplain can pray or, in fact, the chaplain can actually have his prayer censored, as certainly happened in the 2005 and 2006. Both aboard the ship the Anzio and later again at the Naval Station Chapel, we had a situation where a chaplain of a certain faith was being told by a line officer, who was not ordained, how to do his job and how to control his prayers. In the case of the first fitness report, Chaplain Klingenschmitt was marked down basically because of a funeral service that he did, and as I've indicated in the briefs and it's certainly in the record, a military funeral has a military portion, but it also has a religious portion, just as any other funeral would. I understand your argument, but the Board of Corrections made a factual finding that that was not the basis for that action. They made a factual finding that that action was based on the survey results. So how do you get around the fact that we have a deferential standard of review with respect to those determinations? Judge O'Malley, I'm glad you brought that up, because one of the issues that we've argued is that the courts are giving excessive deference to the correction boards, and just as Judge Dyke pointed out, that problems with the Board of Veterans Appeals getting sloppy, then you have situations where the correction boards get very sloppy. The Hasselwander case that I mentioned in the briefs is the DC Circuit having reviewed this and saying that when you have something that is completely illogical and it does not connect to the facts, even if it's a factual finding, they don't have to give the higher level of deference. In other words, if the decision does not make sense, and in this particular case we would urge that it didn't, the courts are not required to give that level of deference to the Board for Corrections. So I indicated in the briefs... But in your particular case, I mean, if in fact the Board of Corrections had said that it relates to something like the fact that he drank coffee in a strange location or something, we could find that to be arbitrary or capricious, or not to make sense. But here you actually had two different things that could conceivably have impacted the decision-making. And in this case, there was an actual survey with survey results that were unflattering, at least. Some of the results were unflattering, and I think we analyzed that somewhat in the reply brief. As I remember, it came out to about 14% of the crew. That ship had a close to 400 folks on board. Some of them filled out the survey, some of them didn't. Presumably those that didn't fill out the survey obviously didn't have an issue. And of those, as we looked at the number and analyzed the numbers, I don't remember my... As age progresses, my memory gets a little bad, but that's why we put it down in the reply brief. The actual number of people, the number of people that didn't fill out the survey, that was the number of people that didn't fill out the survey. So it seems to be an argument for a different finding, which maybe they could have made. But as Judge O'Malley is pointing out to you, how can it be that the Corrections Board determination here is arbitrary and capricious in finding that the survey was the result, was the reason for the lower fitness report rather than the content of his sermon? Because even if that was a factual truth, and if it was the Corrections Board had been correct, it's still an application of the wrong legal standard. Because in this particular situation, what they're trying to do is to codify or to accept a heckler's veto of saying, well, a percentage of the crew, whatever that percentage is, X percent, doesn't like the chaplain's particular form of religion. So therefore, they have the right to retain or prevent him from asserting his religious beliefs. That's illegal under the Religious Freedom Restoration Act. Certainly, it's illegal under the Congressional Codification. But the survey results weren't commenting on not liking his brand of religion. The survey results were commenting on about how he approached those who he was supposed to be pastoring. Very few of them were. And by the way, Your Honor, if you notice, none of those surveys were in the administrative record, okay? We have no factual evidence as to what those surveys actually said. We only know what somebody said they said. And as you all know, in these type of cases, we should be tied to the administrative record. I would love to have actually seen those surveys and perhaps have been helpful for the Court to do it, certainly helpful for the Board to do it. They were never made available. So we have the interpretation... Did you ask that they be made available? They no longer exist, sir. Those command climate surveys... At the time of the Corrections Board decision, they didn't exist anymore. I'm sorry? At the time of the Corrections Board decision, the survey results didn't exist. No, sir. They're retained for two years is all. And I'm retired Navy, so I know how they dispose of their records. But I also did not represent the chaplain at the Board for Correction. I came in later on the Court of Federal Claims case. But it would have been a waste of time at that point to go back and ask for them. They just don't exist. But irrespective, the burden is on the people who are referring to them or using this so-called evidence to have put them in the administrative record. The government puts together the administrative records, not the plaintiff in this case. And there's nothing in the administrative record that shows what these actual or these surveys were not in the administrative record. What was the source of the information as to the surveys? As I remember, the information was items which the commanding officer, at that time it was Captain Carr, had so indicated in various investigation reports, which by the way also did not include the surveys, in the Article 138 Complaint of Wrongs Report. So that was before the Corrections Board? That was before the Correction Boards. The actual surveys were not. But there were quotations from the surveys, correct? There were some quotations from the surveys. But there was also before the Correction Board a finding by one of the investigators that said basically the chaplain's religious rights had been violated. And that's in the record. I know it's in the record. Here we go. In about A230 to actually all the way up to 442 is we did a number of listings of it. One finding by the Navy investigators in the record at A376 and 446. But again, what we're getting into here is a heck of a veto. I think before you run out of time, I want to focus on some bigger questions. There was a lot that occurred after these first witness reports. There are. And you've got some issues, some hurdles to jump over. The question is, what exactly do you think the relief is that you could get here? You would have to prevail on the argument that he had an absolute entitlement to resign from one ecclesiastical endorsement and to simply substitute on his own another one, right? For him to be reinstated. Well, to be reinstated as a chaplain, yes. To be reinstated into the United States Navy, no. Because the provisions allow for him to have been brought back on or to be retained on board in duties other than a chaplain. You've got to remember, Chaplain Klingenschmitt was also an Air Force Academy graduate. He was a major in the Air Force. He was a qualified missile officer. And you're in a situation where there's a, it's very hard to get into and it's a very narrow area of expertise. You have to be qualified in special weapons, sealed authentication system, and so on and so forth, which he would have been and could easily have been signed as a missile officer either on a ballistic missile submarine or as a missile officer on a guided missile cruiser, guided missile destroyer. What authority is there that the Navy was obligated to do that? I mean, he came into the Navy as a chaplain. He sought to continue as a chaplain with this different endorsement than the one he had earlier. And where did he raise the question as to his entitlement to consider to continue in some other capacity? And where do we find that there's an obligation to continue? Sorry, Your Honor. I thought you were finished. I didn't mean to interrupt you. The guiding directive does not provide an obligation. It says consider, you know, for other duties. The opportunity to do that was before the care board. They did not have to retain him as a missile officer. Their only requirement was to consider whether or not he was assigned to other duties. I do not believe he did. That consideration has the overlay of the court-martial, the interim court-martial. I mean, they're allowed to consider all of those facts, are they not? Well, actually, it's an interesting point, Judge O'Malley, because the court-martial at that time had not been approved. And in the military justice system, after the trial, the whole process goes up to the convening authority for review. And they can actually set aside the results, or they can affirm the results. At the time of the care board, that had not been affirmed. And I'm into my rebuttal time now. If I may, if I may. You can say thank you, Mr. Wells. Thank you, Your Honor. Ms. Cotton, am I pronouncing it? It's Cote, Your Honor. Cote, okay. May it please the court. The trial court, the U.S. Court of Federal Claims, correctly found that the Navy's decision to discharge Chaplain Klingenschmitt was not arbitrary, capricious, or contrary to law. The trial court also correctly found that the Navy's decision to separate Chaplain Klingenschmitt was supported by substantial record evidence. Suppose that we were to conclude hypothetically that he was given a lower fitness report because of the content of his sermon, and that his commanding officer had objected to its being sectarian as opposed to non-sectarian, and that was the basis for the poor fitness report. Where would we be? Would that be a violation of the Religious Freedom Restoration Act or not? It might be, Your Honor. I don't know the answer to that question. But here, in this case, Chaplain Klingenschmitt, and I apologize, Your Honor, because we've been referring to him as doctor, but he's referring to himself as chaplain, and I'd like to respect his wishes to be referred that way, so I might mess up a little bit. However, Chaplain Klingenschmitt was separated, and the grounds for his separation had everything to do with the violation of a lawful order that was directed to him. But I thought that the separation was also relied on the 2005 fitness report. Actually, the separation relied on the 2006 fitness report. The 2006, and that's the one that's referred to by the CARE Board and by the Secretary. What page of the record is that?  I don't know off the top of my head. I don't know off the top of my head. Is it your position that even if there was a violation of the RFRA back in 2005, that we can ignore all that because of everything that happened after the fact? The standard of review here is the record that was before the BCNR and the record leading to the Secretary's decision. The record does not demonstrate in this case that Chaplain Klingenschmitt was reprimanded as a result of his sermon or that his beliefs or rights to practice his beliefs were infringed upon at all. There is no connection between the sermon and the survey. There is a connection between the survey and a declining fitness report. There is a connection between Chaplain Klingenschmitt disobeying a lawful order, a lawful order that was directed to him, a lawful order that was consistent with a neutral regulation, a neutral regulation that is generally applicable. So again, your answer presupposes that there's no connection between the sermon and the first fitness report, right? You're saying by definition, you say that that first fitness report related to the survey and not the sermon. Correct, Your Honor. And you're also saying that the 2005 fitness report wasn't the ground for the CARE action, which I'm not so sure about. Okay. Then I'll withdraw that statement, Your Honor, because there were so many, there's so much in this record. It is rich with information. It's rich with evidence that actually supports the decisions of the BCNR and of the Secretary with respect to discharging Chaplain Klingenschmitt. So my question is, assuming that on the initial 2005 fitness report, we were to disagree that the BCNR's finding that that was tied to the survey as opposed to the sermon is supportable, even under a deferential standard of review. Assuming we were to disagree with that, what does that matter given in the record the subsequent actions that the chaplain undertook and for which he was disciplined? That's what I'm trying to understand. Yes, and now I understand, Your Honor, and I apologize for not understanding a little bit sooner. I would prefer that you agree with our position. However, assuming that you disagree with respect to the 2005 fitness report, setting that aside, there's a 2006 fitness report that also discusses other factors that led to Chaplain Klingenschmitt being discharged and no longer being qualified as a chaplain or to serve as a chaplain. Those factors included essentially insubordination and misconduct. You go from there, you have Chaplain Klingenschmitt disobeying a lawful order that was directed to him. Those factors standing alone or together justify the separation. But is that the test? I mean, if they relied on an improper factor, wouldn't we have to set it aside and remand perhaps to give them an opportunity to redo it based on the correct factors? Well, Your Honor, my understanding here is that assuming the court were to believe that the survey or the 2005 fitness report was based upon a sermon, then you might apply the standard for the religious restoration RFA, I apologize, R-F-R-A. But even then, you'd have to point to some activity of his that had been burdened. And there's nothing in the record that demonstrates that any of Chaplain Klingenschmitt's activities with respect to his beliefs, religious beliefs, were burdened. So we would be left with a 2005 fitness report where there is no indication or evidence that any of his rights have been violated with respect to it. This is discretionary. Sorry, I don't understand that argument. I mean, if they relied on the sermon to give him a lower fitness rating in the 2005 fitness report and they relied on the 2005 fitness report in not renewing his chaplaincy, how is he not burdened by that? That was a hypothetical. I was responding to a hypothetical question, Your Honor. Our position is that the 2005 fitness report was based upon a survey that was conducted. Our position here is that the 2005 fitness report, to the extent that it was bad at all, was only with respect from going to an early promote to a must promote. The fitness report was actually very good. Understanding that you think it's a hypothetical because you don't think it had anything to do with the sermon, unlike the supplemental authority that you provided to us from the DC District Court. The argument, at least, that is being made here is that his ability to act as a chaplain and to act to express his religious views as a chaplain were chilled by even a slight demotion or a slight knockdown in his fitness report. And that it wasn't just his beliefs that were being chilled, but it was his ability to express those beliefs as a chaplain in an open forum. Isn't that a difference? I understand and respect the difference that the court is pointing out. Our position is that there's also another difference. And that difference is that he is in a community, a military community, and also acting under the commander of the ANSIO. The commander of the ANSIO is in charge of the command religious program on the ANSIO. Chaplain Klingenschmitt is not the only person on the ANSIO. And Chaplain Klingenschmitt's duties and responsibilities as a chaplain pertain to all of the crew and not only to himself. The record establishes that he was not infringed with respect to exercising his beliefs with those people on the crew who wanted to hear it. So I'll ask you a question about that survey evidence. Yes. What's your response to Mr. Rose's point about the existence of the evidence and where that is? I don't know whether the evidence exists or not, Your Honor. What about at the time of the decisions? I don't believe that it existed at the time of the decisions, Your Honor. But the board had before it descriptions of what was in the survey, right? That is correct. And the descriptions that were of the survey were provided during the Article 138 proceedings investigation. So we do have, and there has never been with respect to the entirety of this case on the administrative level to now a dispute that there were complaints that were logged. There were 80 written comments or there were written comments and 80% of those written comments, which certainly didn't come from the entirety of the crew, contain negative comments regarding Chaplain Klinkin-Schmidt. But I don't know where those survey results are, if they exist at all, Your Honor. Here, the primary issue before the court, in our view, is whether or not there was arbitrary and capricious action, action not contrary to the law, or evidence lacking in the administrative record to support the Navy's decisions regarding Chaplain Klinkin-Schmidt. And the Court of Federal Claims found that there was substantial record evidence that supports the Navy's decisions here. And for all of those reasons, Your Honor, we request that the court affirm the Court of Federal Claims decision. Thank you. Okay. Your Honor, if it may please the Court, I want to try to answer some of the questions that arose as to the surveys. Page 3 on the reply brief. Before you get to that, is it the case that in the care decision, they relied on the 2005 fitness report? My understanding is that what they were required to do and what they said they did was that they relied on the complete record, which would have included the 2005 fitness report. Yes, sir. On page 15 of the Court of Federal Claims opinion, there's a quote here which seems to suggest that they relied on the 2005 fitness report. I think they probably relied on the 2005 fitness report as well as the 2006, both of which were, despite Ms. Cote's comments, were negative reports. Military fitness reports, especially the Navy, there's very subtle issues. Any downtick would, as Judge O'Malley said, act as a chilling effect on the career. Yeah, but is there any real question that the care recommendation would have come out the same way if the 2005 fitness report hadn't existed? Your Honor, we don't know. And there's no way to look into the minds of that. But I would point out to you, and this kind of goes to an answer or a question that you had asked earlier, one of the things that the Care Board was required to do, and that's on page 47 to 48 of the original brief, OPNAV 1120.9, is to make a recommendation as to further service, which they did not do. The other thing is, and this is also on page 22 to 23 in my reply brief, the SECNAV instruction, Secretary of the Navy's instruction, I'm sorry, I go into the vernacular, specifically says that in the case of loss of endorsement, you still don't process somebody out of the 1920.6c, which were not followed. How so? 1920.6c would require some sort of abortive inquiry, okay, for him to show cause why he should have been retained, but he would have had that opportunity for the due process per 1920.6c. I'm sorry, sir. Retained in some other capacity. Just retained in the Naval service. It would depend on the Navy as to how to do that. And that goes with the needs of the Navy. They may have found that they wanted to retain him. They could have also found that they wanted to put him as a missile officer on a submarine. I mean, there's just no way that we can try to speculate as to that. I would, if I could, address the court martial, which was raised by Ms. Cote and also raised in the briefs. Judge Booker, who was the military judge at that court martial, found it to be a lawful order, and Ms. Cote said it was a lawful order. But that finding was based upon the Secretary of Navy Instruction 1730.7 Charlie, or 7c, which was later rescinded by the Secretary of the Navy upon direction of Congress in the National Defense Authorization Act of 2007. And, you know, we had kind of an interesting circumstance here. We had the court martial in September. Then we had the National Defense Authorization Act passed in October, the official rescission in November, the clemency, which asked to have the findings set aside in December. And in January, Admiral Rui, who we had argued and was argued in the military court, was an accuser, despite the fact that the whole basis of that order had been rescinded by act of Congress, approved the findings. In actuality, and again, I didn't represent him at the court martial. We did probably had a different result. Because you didn't raise this whole command influence issue at the court martial, even though you had an opportunity to do so. Actually, the accuser issue was raised at the court martial, and accuser is a form of command influence. Command influence, it's a subset of command influence. And in other words, you have a convening authority who orders the court martial convene, approves the results. But he had an opportunity to pursue that issue and didn't do it. He did pursue it at the court martial. It was ruled against him, but he had the opportunity to do it. And in fact, he did raise the accusers by motion. OK. Thank you, Mr. Walsh. Thank you, Your Honor. So I'm out of time. Thank you, counsel. It was a significant issue. I just want to make, Your Honor, the joint appendix page that I was referring to was 266. 260? 266, Your Honor. 266. Thank you.